Argued and submitted September 11, 2019, affirmed May 5, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

BRENTON KEITH GREINIER,
aka Brenton Keith Greiner,
*Defendant-Appellant.*

Marion County Circuit Court
17CR31617; A165754

486 P3d 839

Defendant appeals a judgment finding him guilty of menacing. Defendant argues that the trial court erred by excluding specific instances of the victim's prior bad acts, which likely affected the trial court's resolution of his self-defense claim. *Held*: Even if the trial court erred in excluding evidence of the victim's prior bad acts toward defendant and another witness, the error was harmless. The trial court accepted defendant's testimony that the victim initiated the assault. Additionally, given the trial court's rationale for rejecting defendant's self-defense claim, the proffered evidence was not likely to have affected its decision.

Affirmed.

Mary Mertens James, Judge.

Rond Chananudech, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Jordan R. Silk, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Presiding Judge, and DeVore, Judge, and Kistler, Senior Judge.*

KISTLER, S. J.

Affirmed.

_____
* Kistler, S. J., *vice* Powers, J.

## KISTLER, S. J.

Defendant appeals from a judgment finding him guilty of menacing.[1] On appeal, he argues that the trial court erred in excluding specific instances of the victim's prior bad acts. The state does not defend the trial court's evidentiary ruling on appeal. It argues instead that any error in excluding the proffered evidence was harmless. We agree with the state and affirm the trial court's judgment.

Defendant and his domestic partner K had been in a relationship for five years and had shared an apartment "for a while." After K found out that defendant had become involved with one of their friends, she went to the apartment one morning and waited for defendant to come home. As K put it, "'I fucking waited for that asshole to come home.' And my intentions were to start an argument" when he arrived.

When defendant opened the door to the apartment, K threw a tube of caulking at him, shoved him, and told him to "get the fuck out." At a later point during the argument, defendant responded by using his forearm to restrain K against or near the door. Three witnesses offered different perspectives on the events that occurred that morning, and we summarize their testimony briefly.

We begin with Officer Burke, who responded to a report of a domestic disturbance. Burke arrived at the apartment shortly after defendant left. When K opened the door, Burke noticed what appeared to be "fresh scratches to [K's] face, her neck and her chest area." K appeared upset, and she told Burke that she had "pushed [defendant] away" and told him to get out of the apartment. She also told Burke that she had thrown a caulking cylinder at defendant. However, she initially declined to say anything more about what happened that morning. After taking photographs to document K's condition, Burke told her that the scratches on her arms looked to be defensive wounds. He explained that it appeared as if something had impeded her ability to breathe and that she had tried to prevent that

---

[1] The state also charged defendant with one count of harassment and three counts of contempt. The trial court acquitted defendant of harassment but found him guilty of the three contempt charges, as well as the charge of menacing. Defendant does not challenge the contempt convictions on appeal.

from occurring. K commented that Burke was "smart" but, when he questioned her further, said that she "would not tell [him] anything to put [defendant] in prison."

Burke asked K about the marks on her face and neck, particularly one mark that appeared to be a ligature mark on her neck. She explained that the apparent ligature mark occurred when her necklace got caught on a bicycle handle and that the marks on her face resulted from her having fallen and hit her face on the coffee table. Burke testified that, based on his experience, he had doubts about K's explanation.

While Burke was interviewing K, defendant was stopped for a traffic violation. The officer who stopped defendant sent Burke a photograph of defendant, which showed that defendant had "scratches to the inner forearms, as well as, like the, basically just the hand and arm region." When Burke asked K how defendant got those scratch marks, she told him that defendant "received the injuries when he pinned her against the door while they were having an argument inside of the apartment."[2] K told Burke "that [defendant] had his forearm against her chest and had pinned her against the door" and that she had been "scratching at [defendant's] arm."

Burke asked K if she had been afraid for her life when defendant pinned her against the door. She replied

> "that the incident where he was actually pinning her against the door didn't put her in fear for her life. But it wasn't until he was doing that and he started yelling at her, and he had a vein that popped out of [his] forehead and she was very descriptive of that.
>
> "She said he turned red in the face and he has a vein in his neck and in his forehead that pop out. And when he was doing that, that was when she was in fear for her life."

Burke testified that K did not elaborate on whether defendant's actions had restricted her breathing, and he agreed with the prosecutor that K had not been "forthcoming beyond the description of being pinned against the wall."

---

[2] K's out-of-court statements were admitted without objection or any limitation on their use.

When asked why he had arrested defendant, Burke explained that, after K shoved defendant, defendant could have walked away. Instead, "there was more contact made," specifically pinning K to the door, which could have caused K's injuries.

K testified to a similar but slightly different version of events. K confirmed that she had initiated the fight by throwing a tube of caulking at defendant, shoving him, and telling him to leave. She explained that the only other physical interaction between them occurred when defendant used his forearm in a defensive manner to fend her off or keep her from hitting him. When asked whether defendant had pinned her against the door, K testified that defendant "was not pushing me up against the door, no. I could still move back if I wanted to move, I could. But I was trying to lean forward to keep hitting him."

On cross-examination, K agreed that she was "the one that usually causes the arguments" and that defendant "tries to get out of the arguments." She agreed that defendant "doesn't usually fight back." When asked whether it was true that she did "assault [defendant] in those arguments," K admitted that "[t]here's been on some occasions [*sic*]." She also acknowledged assaulting defendant on this occasion by throwing the tube of caulking at him and admitted that "there have been other occasions * * * where [she] punched him" and he did not "punch [her] back." Finally, she agreed that, when defendant was using his forearm to restrain her, she was "trying to hit him at that time." She explained that she did not have anything in her hands; she was "just punching [with her] closed fists."

Defendant's testimony added a third perspective. He testified that, "[w]hen [he] opened the door, [K] started yelling and cussing at [him]. She threw a tube of caulking at [him]." He testified that, when K "[is] excited, it can be kind of hard to tell what exactly she's talking about," and he "was kind of trying to figure out what was going on." Defendant explained that, when he first came into the apartment, he "was not aware that [K] was aware of [his] indiscretion," and he did not understand what was prompting her outburst.

Defendant testified that he and K had had arguments in the past and that she "gets very emotional and is—can be, I guess, is very aggressive. And in a lot of cases, things are thrown at me or I'm called names." His response typically has been "to run." He explained that, in those situations, "[he] generally just tr[ies] to leave because of [his] past [criminal history]."[3] Defendant's past attempts to avoid conflict have not always proved successful. He testified, "I try to leave and she'll block the door or I've tried to leave before—she's crawled up [on] my car and punched me through my sun roof."

Defendant testified that, on this occasion, "I held her against the door to—just away from me—and got down the stairs as quickly as I could to my vehicle." When asked on direct if he had pinned her against the wall, defendant testified, "[I]t's one of those things where when she's upset and angry and coming towards me, it's to hold her back enough to where I can get a—I can get a running start and get out of there. I do run faster than she does." Defendant explained that, although he used his forearm to hold K "off of [him]," he did not restrain her in the sense of preventing her from moving. On cross-examination, defendant clarified that he "was asking her to stop. Once [he] realized that she wasn't going to calm down, [he] went down the stairs" and out of the apartment.

After considering that and other evidence, the trial court found defendant guilty of menacing.[4] Before making that finding, the trial court found, as a preliminary matter, "that the State has proved beyond a reasonable doubt that the defense of self-defense does not apply in this case." We quote the court's reasoning on that issue in full:

> "The defendant had opportunity to leave this—the situation and did not take advantage of that opportunity. The defense of self-defense allows a person to use only that force which he or she reasonably believes to be necessary.

---

[3] Several years earlier, defendant had been convicted of attempting to murder his former domestic partner and had been imprisoned for several years for that crime, which he testified caused him to try to avoid confrontations with K.

[4] Defendant had waived his right to a jury and agreed to be tried by the court.

"The defendant testified that he was standing in the doorway when the—when the victim threw the caulking gun toward him and at that—and said that he is faster than the victim, that he can get away from her faster because he runs faster.

"And he could have completely and utterly avoided further conflict at that point and did—did not. In fact, his testimony is that he grabbed her by her wrist and pinned her against the—the door. And the Court finds that that is not the action of a person who is acting in self-defense and using minimal reasonable force to—to protect themselves.

"He didn't leave right away. He said that's what he does. In this case, he didn't do that. And he had the opportunity to leave at that time and did not do that."

Having found that self-defense did not apply, the court found that defendant put K in fear of imminent serious physical injury when he pinned her against the door and, for that reason, was guilty of menacing.

On appeal, defendant does not argue that the trial court applied an incorrect legal standard in assessing his self-defense claim. Rather, he argues that the trial court erred in making two related evidentiary rulings. At the end of his case in chief, defendant called one of his coworkers, who had known both defendant and K for five years. Defense counsel asked the witness if he had "witnessed any interactions" between defendant and K. When the state objected, defense counsel explained that he was "going to ask [the witness] for a reputation [*sic*] for [K]" and that he was laying "the foundation for [the witness's] belief." The court sustained the state's objection and told defense counsel that he could ask the witness about K's reputation but not about specific instances of K's conduct.

Defense counsel accordingly asked the witness whether he was "familiar with the reputation for [K] for violent conduct." The witness said that he was, and he testified that K's reputation was that "[s]he gets violent when she's not on her medication." Defense counsel then asked, "Did she attack you?" The state objected, and the court struck the witness's answer. Defense counsel tried another tack. He asked the witness, "Have you seen her [act] as an aggressor

towards [defendant]?" The state objected again. Defense counsel did not wait for the court's ruling but said that he would like to make an offer of proof.

Much of the colloquy that followed between the court and defense counsel appears to focus on whether the trial court's evidentiary ruling was correct. Defense counsel reiterated that, in his view, he was "entitled to lay a foundation for self-defense" because "defendant [wa]s aware of the alleged victim's activity, based on reputation evidence and other incidents happening between the two of them." The trial court reiterated its ruling on the merits, to which defense counsel asked, "So, my offer of proof is denied?" The trial court did not respond directly to that question but returned to its view that defendant's proffered evidence "is not relevant and it's not permitted."

The trial court then mentioned defense counsel's requested "offer of proof about prior bad acts." The court stated, "I mean, I—my understanding is that you want to make an offer of proof to include—." At that point defense counsel interjected and said, "Well, I'm trying to establish who's generally always the first aggressor in all these arguments. It's her." The court reasoned that it did not "think this witness is qualified to even answer that question unless he has been present * * * at all of the arguments between these two people." Defense counsel acknowledged that the witness had not been present at every argument but explained that he wanted to ask the witness about the arguments the witness had seen. The trial court denied that request, and no offer of proof was made beyond defense counsel's statement that he was "trying to establish who's generally always the first aggressor in all these arguments. It's her."

On appeal, defendant assigns error to the trial court's ruling excluding "[K's] prior acts of violence toward defendant." He also assigns error to the trial court's ruling excluding "evidence of [K's] prior acts of violence toward [the witness]." Citing *State v. Lunow*, 131 Or App 429, 435-36, 885 P2d 731 (1994), defendant reasons that, when a person raises a self-defense claim, the person can introduce specific incidents of the victim's prior conduct to prove the victim's character for violence, as long as the defendant was aware of

that conduct. Defendant concludes that, under *Lunow*, evidence of K's assault on the witness and her earlier assaults on defendant were admissible.

On appeal, the state does not defend the challenged evidentiary rulings but argues that any error was harmless; that is, it contends that there is little likelihood that any error in excluding specific instances of K's past conduct affected the trial court's resolution of defendant's self-defense claim. *See State v. Beisser*, 258 Or App 326, 336, 308 P3d 1121 (2013) (stating that standard for determining whether evidentiary error is harmless). The state argues that the witness's testimony, if admitted, would merely have duplicated evidence already in the record. Additionally, it argues that the trial court's stated ground for denying defendant's self-defense claim demonstrates that the evidence would not have affected the court's decision. Defendant, for his part, notes that, at trial, he "did not dispute grabbing K's arm and pinning her against the door." He reasons that "[t]he reasonableness of his belief that K would continue to violently attack him was a critical element of his self-defense case." And he argues that "[t]he court may have been more inclined to believe defendant's testimony had it admitted the evidence from a third-party [witness] that corroborated it."

ORS 161.209 defines the defense of self-defense. It provides:

> "Except as provided in ORS 161.215 and 161.219, a person is justified in using physical force upon another person for self-defense or to defend a third person from what the person reasonably believes to be the use or imminent use of unlawful physical force, and the person may use a degree of force which the person reasonably believes to be necessary for the purpose."

As the two independent clauses in ORS 161.209 suggest, a self-defense claim generally entails two issues. *See State v. Stapp*, 266 Or App 625, 632, 338 P3d 772 (2014). The first issue is when a person may use physical force to defend themselves; on that issue, ORS 161.209 provides that a person may use force to defend against what the person "reasonably believes to be [another person's] use or imminent

use of unlawful physical force." The second issue is the degree of force that may be used; on that issue, ORS 161.209 provides that a person may use the degree of force that the person reasonably believes "to be necessary for the purpose" of self-defense.

In this case, defense counsel told the trial court that he wanted to make an offer of proof about K's past conduct "to establish who's generally always the first aggressor in all these arguments."[5] That is, he told the trial court that he was offering the evidence on the first issue identified by ORS 161.209—whether defendant reasonably believed that he needed to use force to defend himself against an assault initiated by K. There was, however, no dispute at trial that K was the first aggressor in this instance. The officer, K, and defendant all testified that K threw the tube of caulking at defendant when he walked into the apartment, shoved him, and told him in no uncertain terms to leave. Indeed, in ruling on defendant's self-defense claim, the trial court explicitly accepted defendant's testimony that K initiated the assault when she threw the tube of caulking at him. It follows that any error in refusing to admit the witness's testimony to establish "who's generally always the first aggressor in all these arguments" was harmless.

Defendant raises an additional argument on appeal. He contends that the excluded evidence was also relevant to show whether defendant reasonably believed that the degree of force he used in pinning K to the wall was necessary to defend himself against her assault. The trial court, however, did not deny defendant's claim of self-defense because it concluded that defendant used an unreasonable degree of force when he pinned K to the wall with his forearm. Rather, the court's decision regarding the second issue identified in

_____

[5] When the trial court sustained the prosecutor's objection to the witness's testimony about specific instances of K's prior aggressive acts, defense counsel was entitled to make an offer of proof. To the extent that defense counsel wanted to make an offer of proof by asking the witness to testify regarding each specific instance of past conduct and to the extent that the trial court believed that a summary of the proffered evidence would have been sufficient, it would have been better if the trial court had identified a more orderly procedure for counsel to make an offer of proof. However, defense counsel was able to articulate what he sought to prove, and we assume that the witness would have testified that K was usually the first aggressor when she and defendant argued.

ORS 161.209 was based on an act that occurred at an earlier point in time.

Specifically, the court explained that, when K threw the tube of caulking at defendant as he stood in the doorway, defendant could and should have left immediately. The court reasoned that defendant "could have completely and utterly avoided further conflict at that point and did -did not." Instead, "he grabbed [K] by the wrist and pinned her against the door." The court concluded that, because defendant could have but did not avoid further physical contact by leaving when K first threw the tube of caulking at him, he was not "acting in self-defense and using minimal reasonable force to protect [himself]."

Even if we assume that the witness would have testified that K had acted aggressively or violently in the past, we fail to see how that testimony would have affected the trial court's analysis of defendant's self-defense claim. The question, as the court phrased it, was not whether defendant reasonably believed that he needed to aggressively pin K to the door to keep her from inflicting further harm on him. Rather, the relevant question for the trial court was whether defendant used more force than he reasonably believed was necessary because he could have but did not leave immediately after K threw the tube of caulking at him. On that question, evidence that K had acted violently in the past simply would have supported the trial court's conclusion that defendant should have left sooner than he did.

Given the trial court's rationale, we need not decide whether, as the state argues, the witness's testimony regarding specific instances of K's past aggressive conduct would have merely duplicated the evidence of K's past and present assaultive conduct that was already in the record. Rather, given the trial court's stated rationale, we conclude that the proffered evidence would not have affected the court's decision regarding defendant's self-defense claim.

We recognize that the Oregon Supreme Court has held that ORS 161.219 does not impose a duty to retreat before using deadly force in self-defense and that, in reaching that conclusion, it explained that the second independent clause in ORS 161.209 "assumes a right to meet unlawful

force with *some* level of force and does not suggest that a decision to retreat or otherwise forego the use of the otherwise permissible level of force might be required in some circumstances." *State v. Sandoval*, 342 Or 506, 511, 156 P3d 60 (2007) (emphasis in original); *but see id.* at 514 n 3 (noting possible exceptions to that rule). We also recognize that there may be some tension between *Sandoval*'s reasoning and the trial court's stated reason for rejecting defendant's self-defense claim in this case. Defendant, however, did not argue at trial nor has he argued on appeal that the trial court employed an incorrect legal standard in rejecting his self-defense claim. In these circumstances, it is sufficient to resolve the evidentiary issues that defendant has raised to hold that, given the trial court's stated reason for rejecting defendant's self-defense claim, any error in failing to admit his proffered evidence had little likelihood of affecting the trial court's decision. For that reason, we affirm the trial court's judgment.

Affirmed.